# 24-2777-CV

## United States Court of Appeals

### *for the*

## Second Circuit

SABBY VOLATILITY WARRANT MASTER FUND LTD.,

*Plaintiff-Appellant,*

— v. —

JUPITER WELLNESS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

THOMAS J. FLEMING
NATASHA G. MENELL
SAHAND FARAHATI
OLSHAN FROME WOLOSKY LLP
*Attorneys for Plaintiff-Appellant*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

CP COUNSEL PRESS    (800) 4-APPEAL • (334500)

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Sabby Volatility Warrant Master Fund Ltd. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Table of Contents

Page

JURISDICTION.................................................................................1

ISSUES PRESENTED.........................................................................2

STATEMENT OF THE CASE..............................................................3

    1.    The Parties .............................................................3

    2.    The Amended Complaint: Counts I and II ............................3

    3.    The Amended Complaint: Count III and IV .......................7

    4.    The District Court Decision ..............................................9

STANDARD OF LAW........................................................................12

SUMMARY OF ARGUMENT .............................................................13

ARGUMENT ...................................................................................16

    I.    THE DISTRICT COURT ERRED IN DISMISSING SABBY'S
        FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT.......16

    II.    THE DISTRICT COURT ERRED IN DISMISSING SABBY'S
        SECOND CAUSE OF ACTION FOR PROMISSORY
        ESTOPPEL..........................................................................28

    III.    THE DISTRICT COURT ERRED IN DISMISSING SABBY'S
        THIRD CAUSE OF ACTION FOR NEGLIGENT
        MISREPRESENTATION ................................................35

    IV.    THE DISTRICT COURT ERRED IN DISMISSING SABBY'S
        FOURTH CAUSE OF ACTION FOR NEGLIGENCE ....................41

CONCLUSION .................................................................................45

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abdullahi v. Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009) ..................................................22

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) .................................................12

*Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*,
  545 A.2d 1171 (Del. 1988) ........................................... 27, 36

*Barsky v. Flaherty*,
  Civ. Action No. 9132, 1987 WL 33981 (Del. Ch. Dec. 30, 1987)......................26

*Brickman v. Tyco Toys, Inc.*,
  772 F. Supp. 1054 (S.D.N.Y. 1989) .....................................38

*Brug v. Enstar Grp., Inc.*,
  755 F. Supp. 1247 (D. Del. 1991)..........................................39

*Caleb & Co. v. E.I. DuPont de Nemours & Co.*,
  615 F. Supp. 96 (S.D.N.Y. 1985) ................................... 17-18

*Campbell v. DiSabatino*,
  947 A.2d 1116 (Del. 2008) ...................................................41

*Carter v. HealthPort Techs., LLC*,
  822 F.3d 47 (2d Cir. 2016) ....................................................12

*Chrysler Corp. (Del.) v. Chaplake Holdings, Ltd.*,
  822 A.2d 1024 (Del. 2003) ...................................................29

*Commerzbank AG v. U.S. Bank Nat'l Ass'n.*,
  277 F. Supp. 3d 483 (S.D.N.Y. 2017), *aff'd in part, vacated in part on unrelated grounds*, 100 F.4th 362 (2d Cir. 2024)................................42

*Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, C.A.,
  No. 3231-VCS, 2008 WL 963048 (Del. Ch. Apr. 10, 2008)..............................35

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) ..................................................22

*Duphily v. Delaware Elec. Co-op., Inc.*,
  662 A.2d 821 (Del. 1995) ......................................................43

*DuPont v. DuPont*,
    208 A.2d 509 (Del. 1965) ............................................................ 24-25

*Figueroa v. Tornabene*,
    74 A.D.3d 872 (2d Dep't 2010) ...................................................... 42

*Fulweiler v. Spruance*,
    222 A.2d 555 (Del. 1966) ............................................................... 25

*Glosser v. Cellcor Inc.*, Civ. A.,
    No. 12725, 1994 WL 593929 (Del. Ch. Sept. 2, 1994) ......................... 36, 37, 38

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016) .......................................................... 22

*Harris v. Carter*,
    582 A.2d 222 (Del. Ch. 1990) ........................................................ 42

*IDT Corp. v. U.S. Specialty Ins. Co.*,
    C.A. No. N18C-03-032, 2019 WL 413692 (Del. Super. Ct. Jan. 31,
    2019) ............................................................................ 23, 24

*In re BP p.l.c. Derivative Litig.*,
    507 F. Supp. 2d 302 (S.D.N.Y. 2007) ............................................... 10

*In re Delmarva Sec. Litig.*,
    794 F. Supp. 1293 (D. Del. 1992) .................................................... 39

*In re IAC/Interactive Corp.*,
    948 A.2d 471 (Del. Ch. 2008) .................................................. 25, 26, 27

*In re Sunstates Corp. Shareholder Litig.*, C.A.,
    Civ. A. No. 13284, 2001 WL 432447 (Del. Ch. Apr. 18, 2001). ................ *passim*

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
    14 F.4th 141 (2d Cir. 2021) .......................................................... 12

*Lynam v. Gallagher*,
    526 A.2d 878 (Del. 1987) .......................................................... 25, 26

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
    854 A.2d 121 (Del. Ch. 2004) ...................................................... 40-41

*Mills Acquisition Co. v. Macmillan, Inc.*,
    559 A.2d 1261 (Del. 1989) ............................................................ 36

iii

*Noriega v. Abbott Lab'ys,*
    714 F. Supp. 3d 453 (S.D.N.Y. 2024) ............................................22

*Pereira v. Farace,*
    413 F.3d 330 (2d Cir. 2005) ............................................10

*Selly v. Fleming Coal Co.,*
    180 A. 326 (Del. Super. Ct. 1935) ............................................ 17, 29

*Smith's Est. v. C.I.R.,*
    292 F.2d 478 (3d Cir. 1961) ............................................17

*U.S. Virgin Islands v. Goldman, Sachs & Co.,*
    937 A.2d 760 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) ............................................32

*Unisuper Ltd.* v. *News Corp.,*
    No. 1699-N, 2005 WL 3529317 (Del. Ch. Dec. 20, 2005) ............................................ 32, 33

*Vichi v. Koninklijke Philips Elecs., N.V.,*
    85 A.3d 725 (Del. Ch. 2014) ............................................40

*VonFeldt v. Stifel Financial Corp.,*
    714 A.2d 79 (Del. 1998) ............................................31

*Wilmington Tr. Co. v. Wilmington Tr. Co.,*
    15 A.2d 665 (Del. Ch. 1940) ............................................29

## Statutes & Other Authorities:

28 U.S.C. § 1291 ............................................1

28 U.S.C. § 1332(a) ............................................1

6 Del. C. § 8-303(a) ............................................21

Del. Code Ann. tit. 8, § 173 ............................................ 17, 23

Del. Code Ann. tit. 8, § 213 ............................................ 19, 30

Fed. R. App. P. 4(a)(1) ............................................1

Fed. R. Civ. P. 12(b)(1) ............................................ 9, 12

Fed. R. Civ. P. 12(b)(6) ............................................ 12, 16, 22

ARON GOTTESMAN, DERIVATIVES ESSENTIALS (2016) ............................................20

iv

JAMES D. COX & THOMAS LEE HAZEN, 3 TREATISE ON THE LAW OF
     CORPORATIONS § 20:9 (3d ed. 2023) ....................................................................18

R. FRANKLIN BALOTTI ET AL., THE DELAWARE LAW OF CORPORATIONS AND
     BUSINESS ORGANIZATIONS § 5.31 (4th ed. 2021) .................................... 17, 24, 26

## **JURISDICTION**

The District Court had subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship as between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of the Cayman Islands and Defendant is a Delaware corporation headquartered in Florida.

The District Court issued its Opinion and Order granting Defendant's Motion to Dismiss on September 23, 2024. (JA 135-62.) The Opinion and Order disposed of all claims in Plaintiff's Amended Complaint. Plaintiff filed a Notice of Appeal in the District Court, and this Court, on October 17, 2024. (JA 163.) Plaintiff's appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1).

This Court has jurisdiction under 28 U.S.C. § 1291 to review the District Court's Opinion and Order.

## ISSUES PRESENTED

1.     Did the District Court err in dismissing Plaintiff's breach of contract claim for payment of a dividend where Plaintiff was the holder of shares as of the record date for the dividend, but sold after the record date?

2.     Did the District Court err in dismissing Plaintiff's promissory estoppel claim to receive a dividend as a record date holder where Plaintiff relied on Defendant's public statements that its Board had declared a dividend and set a record date for payment of the dividend?

3.     Did the District Court err in dismissing Plaintiff's negligent misrepresentation claim arising from the non-payment of a dividend to record holders where Defendant announced a record date for the payment of a dividend on multiple occasions even though it was unable to issue the dividend to record holders and failed to exercise due care in making the announcements?

4.     Did the District Court err in dismissing Plaintiff's negligence claim where Defendant failed to exercise due care in issuing a dividend in the form of shares of a subsidiary resulting in a substantial loss to Plaintiff through the creation of a liability in its brokerage account?

## STATEMENT OF THE CASE

### 1.   The Parties

Plaintiff Sabby Volatility Warrant Master Fund Ltd. ("Sabby") is a company formed under the laws of the Cayman Islands with its principal place of business in George Town, Cayman Islands. (JA 28, ¶ 4.)[1]

Defendant Jupiter Wellness, Inc. ("Jupiter") is a Delaware corporation with its principal place of business in Jupiter, Florida. (JA 28, ¶ 5.) Effective September 15, 2023—after the preponderance of the events described below—Defendant changed its name to Safety Shot, Inc. and now trades on the NASDAQ under the symbol SHOT. (JA 28, ¶ 5.) Jupiter is a publicly traded company, now focused on selling a beverage that inhibits the impact of alcohol consumption.

### 2.   The Amended Complaint: Counts I and II

Sabby's Amended Complaint asserts two counts arising from Jupiter's failure to pay a dividend to Sabby, a holder of Jupiter common stock as of the record date for the dividend. These counts seek to recover the value of the dividend and assert claims for breach of contract and promissory estoppel. The allegations in the Amended Complaint are summarized below.

On May 26, 2023, Jupiter entered into an agreement with its wholly owned subsidiary, SRM Entertainment, Inc. ("SRM"), governing the planned separation of

---

[1] Citations to the "JA" refer to the contemporaneously filed Joint Appendix.

SRM's business from Jupiter (the "SRM Restructuring"). (JA 29, ¶ 10.) The SRM Restructuring involved the distribution of shares of SRM stock to Jupiter's shareholders in the form of a dividend (the "SRM Dividend"), with Jupiter retaining a majority of SRM shares and selling other SRM shares in a public offering.

On June 27, 2023, Jupiter's Board of Directors (the "Board") set the close of business on July 7, 2023 as the record date for a distribution of 2,000,000 shares of SRM common stock to Jupiter shareholders of record on that date (the "Record Date"). (JA 29, ¶ 11.) Jupiter issued a press release that same day (the "Press Release") announcing the Record Date, and that Jupiter shareholders would receive one share of SRM common stock for every 19.35 shares of Jupiter common stock they held as of that date. (JA 29, ¶ 12.) Jupiter also announced that the SRM Dividend would be distributed on July 12, 2023 "subject to SRM's Registration Statement on Form S-1 [], as amended [], being declared effective by the U.S. Securities and Exchange Commission (the 'SEC'), the approval of the listing of the SRM Common Stock on the Nasdaq Capital Market ('NASDAQ') and the receipt of certain other approvals in connection with the offering." (JA 72.)

Sabby held 1,413,940 shares of Jupiter common stock on the Record Date, July 7, 2023. (JA 29, ¶ 13.) As a result, Sabby was due approximately 73,072 shares of SRM worth more than $350,000. (JA 29, ¶ 13.) Jupiter's Bylaws assured Sabby

4

the right to a dividend as a record date holder, notwithstanding a later transfer of shares. Section 6.9 of the Bylaws provided, in relevant part:

> [Jupiter's Board of Directors] may fix in advance … a record date for the determination of stockholders entitled to … receive payment of any … dividend, or any … allotment of rights … [and] in such case only stockholders of record on the date so fixed shall be entitled … to receive payment of such dividend, or allotment of rights, … *notwithstanding any transfer of any stock on the books of the Corporation after any such record date fixed as herein provided* . . . .

(JA 31, ¶ 22) (emphasis added).

In addition to its own filings with the SEC, Jupiter also filed reports through its wholly owned subsidiary, SRM. After the Board declared the SRM Dividend, Jupiter amended the draft Registration Statement to reflect the Record Date, advising investors:

> Each holder of Jupiter Wellness Common Stock and each holder of certain warrants issued in Jupiter Wellness' public offering in July 2021 (the "July Warrants") will receive a distribution of one share of our Common Stock for every 19.35 shares of Jupiter Wellness Common Stock held or underlying the July Warrants held, *each as of the record date*. (emphasis added)

(JA 30, ¶ 17.)

The cover page of the draft Registration Statement stated: "The record date is the close of business, New York City time, on July 7, 2023." (JA 30, ¶ 18.) In later

filings, SRM consistently reported a July 7, 2023 Record Date for the distribution of SRM shares. (JA 29, 30, ¶¶ 15, 18-20.)

Jupiter did not distribute the SRM Dividend on July 12, 2023. (*See* JA 30, ¶ 16.) Jupiter pushed the distribution date back multiple times, citing ongoing review by the SEC and pending approval from NASDAQ. (*See* JA 29, ¶ 14; JA 72) Each time, Jupiter confirmed that the Record Date for the SRM Dividend remained July 7, 2023. (JA 29, ¶¶ 15-19.)

Jupiter finally issued the SRM Dividend on or about August 15, 2023, but instead of distributing SRM shares to Jupiter shareholders as of the Record Date, the SRM shares were distributed to shareholders who owned as of August 14, 2023. (JA 30, ¶ 16.)

Jupiter never changed the Record Date. Nor did it ever announce that holders as of August 14, 2023 would receive the SRM Dividend. In fact, Jupiter's Form 8-K, filed a week after the distribution, identified the Record Date as July 7, 2023, reporting: "On August 14, 2023, the Company distributed 2,000,000 shares of Common Stock owned by the Company to its stockholders and holders of certain warrants based on the record date of July 7, 2023." (JA 30, ¶ 16.)

The Prospectus that SRM issued to Jupiter shareholders was filed on August 16, 2023, and contained the following disclosure:

> Each holder of Jupiter Wellness Common Stock and each
> holder of certain warrants issued in Jupiter Wellness'

6

> public offering in July 2021 (the "July Warrants") will receive a distribution of one share of our Common Stock for every 19.35 shares of Jupiter Wellness Common Stock held or underlying the July Warrants held, each *as of the record date*. (emphasis added)

(JA 30-31, ¶¶ 17, 20.)

To this day, Jupiter has not offered any explanation for the distribution of shares to the wrong set of shareholders (i.e., shareholders as of August 14, 2023 instead of the Record Date holders).

Sabby did not receive 73,072 shares of SRM common stock that were due based on its Jupiter shareholdings on July 7, 2023. (JA 31, ¶ 24.) After the Record Date, Sabby sold all of its Jupiter shares with the understanding that it was entitled to the SRM Dividend based on its Record Date ownership. (JA 31, ¶¶ 25-26.) Sabby read and relied upon the Press Release and related public disclosures by Jupiter in making decisions to buy, hold, and sell Jupiter common stock. (JA 29, ¶¶ 13, 15.)

### 3. The Amended Complaint: Count III and IV

Sabby asserted two negligence-based claims. The third count of the Amended Complaint asserts a claim for negligent misrepresentation on the premise that Jupiter failed to exercise due care in announcing the Record Date when it had no ability to issue shares to record date holders. The Amended Complaint asserts a fourth count for negligence arising from Jupiter's distribution of the dividend in a careless

manner. Jupiter's distribution to holders on August 14, 2023, in fact, caused Sabby substantial and unanticipated loss, worth more than $350,000.

After the Record Date, Sabby established a short position in Jupiter stock. (JA 31, ¶ 25.) On August 14, 2023, Sabby held approximately 1,713,986 shares in Jupiter "short," meaning Sabby had sold this number of Jupiter shares and would have to purchase shares to close out the position. (JA 32, ¶ 26.)

The distribution of SRM shares "long" to Jupiter holders required a corresponding "short" entry for sellers such as Sabby. As a result of its short position on Jupiter, Sabby received SRM shares "short" on the distribution date. (JA 32, ¶¶ 27-28.) In effect, Jupiter placed an unanticipated liability in Sabby's brokerage account, without notice or warning to Sabby. (JA 32, ¶ 27.) Sabby was forced to spend over $350,000 to buy SRM shares in order to pay off the liability. (JA 32, ¶ 27.)

Jupiter failed to exercise reasonable care in issuing the SRM Dividend. (JA 32, ¶ 29.) An issuer exercising reasonable care would have promptly alerted its transfer agent, as well as Depository Trust Company and FINRA, of the announced Record Date: this is customary, accepted, and *expected* practice for issuers of publicly traded securities. (JA 32-33, ¶ 30.) Jupiter's carelessness caused the SRM Dividend to be distributed to entirely the wrong set of shareholders: Jupiter failed to ensure that holders as of the announced Record Date of July 7, 2023, were identified

8

on its own records and the records of broker-dealers so that those entitled to the SRM distribution would receive the SRM Dividend. (JA 32-33, ¶¶ 30.)

As a result of its negligence, Jupiter was unable to distribute the SRM Dividend to Jupiter's record holders as of July 7, 2023. (JA 33, ¶ 31.) Jupiter was further negligent in not realizing that its distribution would go to Jupiter's holders as of August 14, 2023. (JA 33, ¶ 31.)

Jupiter was well aware of short interests in its stock through public reports available on NASDAQ, among other secondary sources. (JA 31, ¶ 25.) NASDAQ regularly reports an estimate of short positions on traded shares, including Jupiter's. For example, as of July 31, 2023, NASDAQ reported the aggregate short interest in Jupiter was 1,507,316 shares. (JA 31, ¶ 25.)

In trading Jupiter shares, Sabby acted at all times in reasonable and anticipated reliance upon Jupiter's multiple press releases announcing and reaffirming the July 7, 2023 Record Date set by the Board. (JA 29, 34, ¶¶ 13, 15, 44.) Sabby did not know, and had no reason to expect, that Jupiter would distribute the SRM Dividend to holders as of August 14, 2023, instead. (JA 32, ¶ 26.)

### 4. **The District Court Decision**

Jupiter filed a Motion to Dismiss the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing and 12(b)(6) for failure to state a claim, on January 5, 2024. (JA 38-68.) The District Court, per the Honorable

Katherine Polk Failla, granted Jupiter's Motion in an Opinion and Order dated September 23, 2024, finding that each Count failed to state a claim.[2]

The District Court ruled that the sale of Jupiter shares after the Record Date deprived Sabby of "standing" to pursue a claim for breach of contract. (JA 149.) The District Court found that Jupiter changed the Record Date from July 7 to August 14, 2023, even though the Amended Complaint and Jupiter's SEC filings did not indicate such a change. (JA 154.) The District Court further ruled that Sabby could not reasonably rely on Jupiter's multiple public announcements regarding the Record Date for the SRM Dividend, including the announcement that the Board had in fact set July 7, 2023 as the Record Date. (JA 29, ¶ 11; JA 151-54.) The District Court dismissed Sabby's promissory estoppel claim, holding that Jupiter's announcement and repetition of the Record Date in multiple press filings and SEC documents did not constitute an enforceable promise. (JA 151-54.) As an alternative, the District Court again held that Sabby's reliance on Jupiter's statements regarding the Record Date was not reasonable. (JA 154.)

---

[2] Although Jupiter is a Delaware corporation, its bylaws designate New York as the forum for any claim concerning its internal affairs. (JA 29, ¶ 7.) The District Court applied Delaware law to all counts, as neither party proposed the law of any other forum. *See Pereira v. Farace*, 413 F.3d 330, 341 (2d Cir. 2005) (applying Delaware law to issues raised in claim for improper payment of dividend by Delaware corporation); *In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 307 (S.D.N.Y. 2007) (Federal courts in New York "apply New York's choice of law principles," which generally "require[] that claims related to corporate affairs—*i.e.*, issues involving the rights and liabilities of a corporation—are governed by the internal affairs doctrine").

The District Court dismissed the negligent misrepresentation claim on the ground that statements "released to the [pecuniary] public at large" could not be the basis for a negligent misrepresentation claim, and again, that Sabby could not reasonably rely on Jupiter's statements regarding the Record Date. (JA 156.)

The District Court rejected the negligence claim to recover for the loss caused by the distribution on the incorrect date on the grounds that Jupiter did not owe Sabby a fiduciary duty. (JA 159-61.) The District Court's analysis of each Count is discussed in further detail below.

Sabby filed a notice of appeal from the Opinion and Order on October 17, 2024. (JA 163.)

## <u>STANDARD OF LAW</u>

This Court reviews a District Court's grant of dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim "*de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 147 (2d Cir. 2021). A defendant's factual allegations are "entitled to little weight at this stage of litigation" and the Court will "credit the plaintiffs' plausible theor[ies] when evaluating a Rule 12(b)(6) motion." *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021).

On appeal from a District Court's dismissal for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1), this Court "review[s] *de novo* the district court's conclusions of law, as well as findings that are based on undisputed facts evidenced in the record." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

## SUMMARY OF ARGUMENT

Plaintiff asserted breach of contract and promissory estoppel claims based on Defendant's announcement of a record date for a dividend in the form of a distribution of a portion of the shares of a subsidiary, SRM. Plaintiff held Jupiter shares on the Record Date, but sold thereafter. The District Court dismissed the breach of contract claim, finding that the sale after the Record Date, as a matter of law, passed any claim to the purchaser and deprived Plaintiff of "standing." But Jupiter's Bylaws are clear that a record date shareholder retains its right to a dividend and that a transferee after the record date acquires no such right. The District Court's ruling is contrary to established Delaware precedent and threatens to upend established market practices where shares frequently trade "ex-dividend."

The District Court found that Jupiter changed the Record Date. The Amended Complaint, however, pled that no such change occurred. The District Court's fact finding at the pleading stage was not only contrary to the record, but also clear error.

The District Court sought to buttress its dismissal on the theory that the SRM Dividend was a "spin-off dividend," identical to one where a corporation issues its own capital stock. The District Court acknowledged that shareholders may have contractual rights to cash and property dividends, but concluded that the SRM Dividend was the same as one in the form of a corporation's capital stock, where no contractual right exists. The District Court's view fundamentally misunderstands

13

corporate law. When a corporation issues its own shares as a dividend, as in a stock split, the corporation's assets are neither dismissed nor altered. For this reason, Delaware courts have ruled that there is no contractual right to a dividend in the form of the issuer's own shares. The SRM Dividend, like a cash dividend, constituted a distribution of Jupiter's property, diminishing its assets. Delaware law is clear that shares of a subsidiary constitute a dividend of corporate property, the same as cash. The District Court's concept of a "spin-off" dividend is contrary to the Delaware General Corporation Law and unsupported by Delaware law.

The District Court dismissed the promissory estoppel claim on the ground that Sabby could not reasonably rely on Defendant's Press Release announcing the Record Date. Contrary to the District Court's analysis, Sabby relied on a statement of fact by Jupiter, not a statement of future intent. The factual statement upon which Sabby relied was the Board's declaration of a dividend and setting July 7, 2023 as the Record Date, repeated by Jupiter multiple times. Indeed, the very purpose of the record date announcement was to induce reliance on the part of shareholders, assuring them that a dividend had been declared and would issue, albeit with uncertainty as to timing. Sabby pled each of the elements of promissory estoppel: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action on the part of the promisee; (iii) the promisee reasonably relied on the promise; and (iv) injustice can be avoided only by enforcement of the promise.

14

Sabby also pled two negligence-based claims. The third count alleged negligent misrepresentation arising from Jupiter's lack of due care in announcing the Record Date when it had no ability to deliver the SRM Dividend to Record Date holders. The District Court dismissed this claim, holding that Jupiter's public announcements could not give rise to such a claim. The District Court's exemption from negligence for statements that are directed to both protected parties and the public at large finds no support in Delaware law.

Sabby's fourth claim sounded in negligence, alleging that Jupiter failed to exercise due care in the actual distribution of the SRM Dividend, causing financial loss to Sabby when a negative number of SRM shares were deposited in its brokerage account. The District Court dismissed this count on the ground that Jupiter's Board did not owe a fiduciary duty to Sabby. The District Court failed to address the well-pled allegation in the Amended Complaint that Jupiter owed—and breached—an ordinary duty of care. The fourth count was not premised on a fiduciary duty claim, and it was error for the District Court to so rule.

For all these reasons, the District Court's Opinion and Order should be reversed.

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN DISMISSING SABBY'S FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

Sabby's first cause of action asserted a claim for breach of contract based on its ownership of Jupiter shares as of the dividend Record Date. The dividend was in the form of SRM shares.

The District Court dismissed Sabby's breach of contract claim on the grounds that Sabby lost "standing" by selling its shares of Jupiter stock after the Record Date. According to the District Court, any such claim passed to the buyer of Sabby's shares. The District Court found that the Board changed the Record Date from July 7 to August 14, 2024, eliminating any rights of Sabby. As an alternative, the District Court ruled in a footnote that the SRM Dividend was a "spin-off dividend" to which no shareholder had a contractual right.

The District Court's ruling ignores established Delaware law affording record holders rights to dividends. Among other things, the District Court failed to address Jupiter's Bylaws which are crystal clear that a transferee after the record date acquires no right to a dividend. The District Court's further finding that Jupiter's Board changed the Record Date from July 7 to August 14, 2023 is contrary to the allegations of the Amended Complaint, which must be assumed true on a motion pursuant to Fed. R. Civ. P. 12(b)(6). Last, the District Court's concept of a "spin-off dividend" is contrary to Section 173 of the General Corporation Law, which

specifies three types of dividends: "cash … property … or in shares of the corporation's capital stock." Del. Code Ann. tit. 8, § 173. The concept of a "spin-off dividend" finds no support in Delaware law. The SRM Dividend in any case did not involve a "spin-off," where the parent corporation issues 100% of the subsidiary's shares to the parent's shareholders. The SRM Dividend was part of a restructuring where Jupiter retained a major stake in SRM and also sold shares to new investors. It is a "classic "property" dividend.

The District Court accepted the well-established principle that a shareholder possesses a contractual right to a dividend once declared. (JA 149 n.5); *Smith's Est. v. C.I.R.*, 292 F.2d 478, 479 (3d Cir. 1961) ("[W]henever a lawful dividend on particular stock is fully declared each stockholder becomes a creditor of the corporation with a vested right to be paid a specified sum at some future time."); *Selly v. Fleming Coal Co.*, 180 A. 326, 328 (Del. Super. Ct. 1935) ("The right of action is in the nature of a contract and grows out of the declaration of a lawful dividend."). As a leading treatise explains, "It follows that ordinarily, once a dividend in cash or property is declared it cannot be rescinded." R. FRANKLIN BALOTTI ET AL., THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 5.31 (4th ed. 2021).

The fact that Sabby transferred its Jupiter shares after the Record Date does not deprive it of such a claim. Nor is the claim transferred with the shares. In *Caleb*

*& Co. v. E.I. DuPont de Nemours & Co.*, 615 F. Supp. 96, 105 (S.D.N.Y. 1985), the court analyzed Delaware law on the issue and explained: "the declaration of the dividend creates a debtor-creditor relationship between the corporation and the owner of the stock on the date of declaration . . . . However, the ultimate beneficiary of the dividend will still be controlled by owner of the stock on the record date." A leading treatise well summarizes this principle:

> In general, any dividend already declared when shares are transferred belongs to the transferor and does not pass by the transfer, and the fact that the dividend is made payable at a future date does not alter the rule. Frequently this problem is solved by the directors' declaration fixing a record date in order to determine who is entitled to the distribution.

JAMES D. COX & THOMAS LEE HAZEN, 3 TREATISE ON THE LAW OF CORPORATIONS § 20:9 (3d ed. 2023) ("A share of stock has been compared to a fruit tree: the seller may retain any fallen fruit (declared dividends) on sale of the tree but may not shake the tree to recover more fruit after the sale.").

Similarly, in *In re Sunstates Corp. Shareholder Litig., C.A.*, the Chancery Court considered as an "obvious" example of a claim "not viewed as being transferred along with the stock," as "the situation where a dividend is declared and shares are sold 'ex dividend' after the record date." Civ. A. No. 13284, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001). The Chancery Court noted that "the declaration of a lawful dividend has long been understood to give stockholders as of

the record date standing as creditors to sue at law for the recovery of the amount

due." *Id.*

Consistent with this precedent, Jupiter's Bylaws are clear that a transfer after

the Record Date does not include any right to a dividend:

> <u>Section 6.9 Closing of Books</u> .… in lieu of closing the
> stock transfer books, the Board may fix in advance a date,
> not exceeding sixty (60) days preceding … the date for
> payment of any dividend … as a record date for the
> determination of stockholders … to receive payment of
> any such dividends, … and *in such case only stockholders*
> *of record on the date so fixed shall be entitled ... to receive*
> *payment of such dividend, ... and notwithstanding any*
> *transfer of any stock on the books of the Corporation after*
> *any such record date fixed as herein provided.* (emphasis
> added)

(JA 83.)

The Bylaws implement Section 213 of Delaware General Corporation Law which

provides:

> In order that the corporation may determine the
> stockholders entitled to receive payment of any dividend
> or other distribution or allotment of any rights or the
> stockholders entitled to exercise any rights in respect of
> any change, conversion or exchange of stock, or for the
> purpose of any other lawful action, the board of directors
> may fix a record date, which record date shall not precede
> the date upon which the resolution fixing the record date
> is adopted, and which record date shall be not more than
> 60 days prior to such action.

Del. Code Ann. tit. 8, § 213(c).

The District Court's holding would upend established practices in the securities markets, which operate on the assumption that shareholders as of an announced record date have an enforceable right to the dividend. *See* ARON GOTTESMAN, DERIVATIVES ESSENTIALS §§ 2.10, 3.10 (2016) ("Stocks are worth more before their ex-dividend date as only those who hold the stock before the ex-dividend date receive the dividend. Hence, if an investor exercises [a put] option before the ex-dividend date they will have to deliver a more valuable underlying asset."); *In re Sunstates Corp. S'holder Litig., C.A.*, 2001 WL 432447 at *3 n.11 ("As of the record date for the dividend, shares customarily trade 'ex dividend,' meaning that the seller, who is the record holder as of the record date, retains the right to the dividend. The buyer knows this and pays a price that reflects that fact.").

The District Court's analysis rested on the proposition that a breach of contract claim based on a corporation's bylaws *always* results in an injury to the stock, which "cannot be asserted by former shareholders." (JA 148.) Here, the District Court erred in finding that Sabby's contract claim was a direct claim alleging "injury to the stock," as the stock Sabby held as of the Record Date suffered no injury aside from a *delay* in the distribution of the SRM shares. Presumably, the new holder of those shares received the SRM Dividend that Sabby was entitled to. Indeed, the notion that such a claim could "travel" with the stock is paradoxical—only Sabby could ever assert such a claim, because only Sabby owned these shares on the Record Date of

20

July 7, 2023. Moreover, Jupiter's Bylaws prohibit a transferee from acquiring that claim after the Record Date. The transferee acquires shares subject to the Bylaws and is therefore on notice that a sale after the Record Date does not include a right to the dividend, a reality reflected in the sale price. Under the District Court's analysis, a selling record holder would lose its right to the dividend, while the Bylaws would bar the purchaser from acquiring any such right. Apparently, Jupiter would keep the dividend for itself.

The District Court cites to a handful of cases for the proposition that, as a general matter, breach of contract claims premised on a corporation's bylaws are not personal. (JA 148-49.) However, none of these cases involved a claim based on a right to a dividend. As described in greater detail above, such a claim is uniquely personal given that the claim had already vested in the holder of the stock on the Record Date—*i.e.*, Sabby—and could not be transferred after the Record Date. The Chancery Court in *In re Sunstates* explains exactly why the right to a dividend is an exception to the general proposition that the District Court relies upon:

> 6 Del. C. § 8-303(a) . . . provides that "upon delivery of a ... security to a purchaser, the purchaser acquires all rights in the security that the transferor had or had power to transfer." The phrase "all rights in the security" can be understood as distinguishing between personal rights of the holder, on the one hand, and rights that inhere in the security itself, on the other. For example, *the right to receive payment of a lawfully declared dividend is a separate property right of the record stockholders and, thus, is not a right "in the security."*

21

*In re Sunstates Corp. S'holder Litig.*, C.A., 2001 WL 432447 at *3 (emphasis added).

Moreover, the District Court found that Sabby did not hold Jupiter stock on the Record Date because "the record date was changed" and "ultimately set for August 14, 2023." (JA 135, 139.) The Amended Complaint made clear, however, that the Record Date never changed and always remained July 7, 2023. (JA 29 30, ¶¶ 11, 13, 15, 16-18.) Jupiter's SEC filings also state that the Record Date remained July 7, 2023. (JA 30, ¶¶ 17-18.) Jupiter simply issued the SRM Dividend to the wrong class of shareholders (*i.e.*, holders as of August 14, 2023). The District Court's reliance on facts that are both outside of, and contrary to, the Amended Complaint was improper on a motion under Fed. R. Civ. P. 12(b)(6), where "the Court must assume all well-pleaded facts to be true, 'drawing all reasonable inferences in favor of the plaintiff.'" *Noriega v. Abbott Lab'ys*, 714 F. Supp. 3d 453, 457 (S.D.N.Y. 2024). *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 558, 560 (2d Cir. 2016) (vacating and remanding where district court relied on materials outside the pleading); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 169 (2d Cir. 2009) ("On review of a district court's grant of a motion to dismiss, [the Circuit Court] assume[s] as true the facts alleged in the complaints, construing them in the light most favorable to the appellants.").

In a footnote, the District Court offered another basis to dismiss the breach of contract claim, ruling that the SRM Dividend should be "classified as a 'spin-off

dividend'" and "a party has no contractual right to a spin-off dividend based on a corporation's declaration of its intention to issue such a dividend." (JA 149, n.5.)

The concept of a "spin-off dividend," however, has no basis in Delaware law. Section 173 of the Delaware General Corporation Law, "Declaration and Payment of Dividends," provides in relevant part "No corporation shall pay dividends except in accordance with this chapter. Dividends may be paid in *cash*, in *property*, or *in shares of the corporation's capital stock*." Del. Code Ann. tit. 8, § 173 (emphasis added.) The SRM Dividend was neither cash nor "shares of [Jupiter's] capital stock." Under Section 173, it is properly classified as a "property" dividend.

As noted by the District Court (citing to Defendant's brief), "when Delaware corporations declare a cash or property dividend, they create a binding contract to pay the dividend to holders as of the dividend's record date." (JA 149, n.5) (brackets omitted). However, the District Court created a fourth category of dividend, a "spin-off dividend," which it ruled was the same as shares of the corporation's capital stock. For company shares, no contractual right is created to a dividend. The District Court relied on *IDT Corp. v. U.S. Specialty Ins. Co.*, C.A. No. N18C-03-032, 2019 WL 413692, at *13 (Del. Super. Ct. Jan. 31, 2019), as support for the classification of "spin-off dividend." But *IDT Corp.* is an insurance coverage case that did not involve a dividend. The court there noted that "the word 'spin-off' is merely a short-hand term *used in corporate transactional parlance* for a certain type of dividend."

23

*Id.* (emphasis added). In fact, the *IDT Corp.* court explicitly found that "in Delaware statutory terms, a 'spin-off' is a dividend paid in the property of the parent corporation, *not* a sale of its securities." *Id*. (emphasis in original.) The transaction in *IDT Corp*., moreover, was fundamentally different. There, the "spin-off" transferred ownership of the subsidiary to the parent corporation shareholders. *See id.* Here, Jupiter retained a control stake in SRM after the dividend, while selling new shares in a public offering.

The SRM Dividend is properly classified as a "property" dividend, an in-kind distribution of a corporate asset, *i.e.* shares of a subsidiary. *Id*. Once cash is distributed, the assets of the corporation are diminished. So, too, when the corporation distributes shares in a subsidiary. Balotti, *supra*, § 5.31. Because a dividend in the form of subsidiary shares is a "property" dividend, it has the same attributes as a cash dividend with respect to the corporation's obligation to deliver the dividend. *See* Balotti, *supra*, § 5.31 ("Upon the declaration of a cash dividend, the corporation becomes indebted to the stockholder and the stockholder may recover the declared amount in a contract action against the corporation. It follows that ordinarily, once a dividend in cash or *property* is declared it cannot be rescinded.") (emphasis added).

In *DuPont v. DuPont*, the Delaware Supreme Court determined that shares of stock in another corporation are not "stock dividends" as that term is typically used

in law. *See* 208 A.2d 509, 511-12 (Del. 1965); *accord In re IAC/Interactive Corp.*, 948 A.2d 471, 509-11 (Del. Ch. 2008) (finding that shares of subsidiary are not a "stock dividend"). Similarly, in *Fulweiler v. Spruance*, 222 A.2d 555, 558-59 (Del. 1966), the Delaware Supreme Court again held that a distribution of shares in another corporation did not constitute a "stock dividend." This precedent distinguishes between a "stock dividend"—essentially a split of the corporation's capital stock executed through a dividend—and a dividend of cash or property that diminishes the assets of the corporation. *In re IAC/InterActive Corp.*, 948 A.2d at 510 (a stock dividend is one where "all corporate property remains in the corporation").

The analysis in *In re IAC/Interactive, Inc.* is instructive. There, the Chancery Court found that the issuance of a dividend in the form of subsidiary shares was not a "stock dividend." *Id.* at 509-11. The court looked to *Lynam v. Gallagher*, 526 A.2d 878 (Del. 1987), which held:

> A stock dividend takes nothing from the property of the corporation and adds nothing to the interests of the stockholders. The title to all corporate property remains in the corporation; however, corporate profits previously available for distribution in cash dividends are permanently appropriated to fixed capital . . . . [A] stock dividend does not distribute property to the stockholders; it merely changes the form of their investment by increasing the number of their shares, thereby diminishing the value of each share and leaving the aggregate value of their stock in the corporation the same.

*Lynam*, 526 A.2d at 882. (citations omitted).

The *IAC/Interactive* court opined: "The Supreme Court's analysis [in *Lynam*] is consistent with the widely understood notion, recognized in this court, that a dividend is 'a distribution by a corporation to its shareholders of a share of the earnings of the corporation.'" 948 A.2d at 511. The Chancery Court recognized that a cash or property dividend had those characteristics, in contrast to a "stock dividend." *Id.* at 510-11; *accord* Balotti, *supra*, § 5.31, n.527 ("[T]he stock in question was that of a wholly owned subsidiary and not that of the corporation in question. Such a dividend would normally be characterized as a property dividend, not a stock dividend.").

Here Jupiter distributed shares of an asset, SRM, which diminished the value of Jupiter on issuance. Moreover, SRM received a cash infusion from its offering, giving its shares a value that they did not have as a subsidiary. The SRM Dividend is thus properly classified as a "property" dividend, indistinguishable from a cash dividend.

The authorities cited by the District Court do not command a different conclusion. In *Barsky v. Flaherty*, no dividend was declared at all, and relevant conditions precedent had not come to pass. Civ. Action No. 9132, 1987 WL 33981, at *7 (Del. Ch. Dec. 30, 1987) ("The resolution did not declare a dividend . . . . The resolution has none of the characteristics of a dividend, nor could it have any

contractually binding effect, because its conditions precedent have not yet been satisfied."). Here, the pleading alleges that a dividend was declared, and there are no conditions precedent at issue given that the dividend *was* distributed, it was just distributed to the wrong group of shareholders.

The District Court also relied on *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1175 (Del. 1988). (JA 149 n.5.) But *Anadarko* did not address the failure to issue a dividend of subsidiary shares. Rather, the case concerned the existence of a fiduciary relationship between shareholders of a spin-off corporation and the board of the former parent company. 545 A.2d at 1172. The District Court found that no such relationship existed. *See id.* Here, Sabby does not seek to enforce rights against Jupiter as an SRM shareholder, but as a direct shareholder of Jupiter as of the Record Date.

The *IAC/Interactive* court explained that *Anadarko* did not alter its analysis:

> Liberty is correct that in the Anadarko and MCA decisions the Supreme Court and this court independently describe a spin-off of a wholly owned subsidiary through a distribution of shares as a "stock dividend." However, the significance of the legal distinction of the term "stock dividend" was not at issue in those cases. Therefore, those passing references do not undercut the widely acknowledged technical understanding of the term "stock dividend" and the supporting Delaware precedent squarely addressing this issue.

*In re IAC/InterActive Corp.*, 948 A.2d at 510.

The District Court also states that the Amended Complaint "did not raise the argument that the SRM Dividend was a property dividend as a basis for its breach of contract claim." (JA 149 n.5.) Sabby was not required to parse Section 173 of the Delaware General Corporation Law at the pleading stage. The classification of the SRM Dividend as a "property" dividend is a legal conclusion which the Amended Complaint alleges sufficient facts to support—namely, that the dividend was of SRM stock, that SRM is a subsidiary of Jupiter, and that SRM's stock would also be sold through a public offering with a percentage retained by Jupiter. (JA 29-31, ¶¶ 10, 11, 16, 21.)

For the foregoing reasons, this Court should reverse the District Court's dismissal of the first cause of action in the Amended Complaint.

## II. THE DISTRICT COURT ERRED IN DISMISSING SABBY'S SECOND CAUSE OF ACTION FOR PROMISSORY ESTOPPEL

Sabby's second cause of action asserted a claim for promissory estoppel based on Jupiter's promises through repeated public statements that the SRM Dividend had been declared with a Record Date of July 7, 2023, and "through its bylaws that holders of Jupiter stock that obtained their shares after the record date would not receive the benefit of the dividend." (JA 34, ¶ 41).

The District Court dismissed Sabby's promissory estoppel claim, holding that Jupiter's announcement and repetition of the Record Date in multiple press filings

and SEC documents did not constitute an enforceable promise. (JA 151-54.) As an alternative basis for its ruling, the District Court held that Sabby's reliance on Jupiter's statements regarding the Record Date was not reasonable. (JA 154.) The District Court erred with both conclusions.

A claim for promissory estoppel must show that "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Chrysler Corp. (Del.) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003).

*First*, the District Court failed to recognize that the Board's declaration of the Record Date was not a statement of future intention, but rather a statement of fact and an acknowledgment of a then-existing legal obligation. As has long been held in Delaware, "the declaration of the lawful dividend creates an obligation of the corporation and there exists a right of action on the part of the stockholder to enforce its payment." *Selly v. Fleming Coal Co.*, 180 A. 326, 328 (Del. Super. Ct. 1935); *see also Wilmington Tr. Co. v. Wilmington Tr. Co.*, 15 A.2d 665, 667 (Del. Ch. 1940) ("[W]hen a dividend is declared, it is, in effect, set aside by the corporation, as money in hand, for the benefit of the stockholder entitled, though it is not then

payable . . . . [I]f such dividend is not paid when due it may be recovered in an appropriate action by the stockholders.").

Pursuant to Jupiter's bylaws, the Board could "fix in advance . . . a record date for the determination of stockholders entitled to" the dividend, and if the Board did so, "*only stockholders of record on the date so fixed* shall be entitled" to receive the dividend. (JA 31, ¶ 22) (emphasis added). Sabby alleges that Jupiter's public statements—through both its press releases and SEC filings—informed Sabby that the Record Date *had* been set, and had been set at July 7, 2023. (JA 29-31, ¶¶ 12, 15-20). There is nothing uncertain or conditional in this language, or in the announcements of the Record Date. Delaware law empowers Jupiter's record-date bylaw. Del. Code Ann. tit. 8, § 213. The statute and bylaw allowed *the Board* to set the Record Date on a date certain. The statute and bylaws did not contemplate that the Record Date could change without further Board action—or inaction. The statute and bylaws did not contemplate anything uncertain or conditional about such date once set.

The Board took no further action to change or suspend the Record Date. Jupiter even reported the Record Date *after* the SRM Dividend was distributed, confirming that the Board never changed the date. (JA 30, ¶ 16.) Thus, the Record Date was a date certain established by the Board by past action. The Board's announcement of the Record Date was not a future-looking "expression[] of

expectation, opinion, or assumption," as the District Court held (JA 152), but a certain and definite announcement of the Board's past action. The cases relied upon by the District Court are readily distinguishable in this respect.

The District Court first cited *VonFeldt v. Stifel Financial Corp.*, 714 A.2d 79, 87 (Del. 1998), for the proposition that a promissory estoppel claim cannot arise from a statement in a public filing that did not amount to a "'promise' on which [plaintiff] could rely." (JA 152-53) (alteration in original.) *VonFeldt* is far afield, however: that case involved claims by a corporation's director against the corporation for contractual indemnification. *VonFeldt*, 714 A.2d at 80. The director could not produce his employment agreement (which he claimed established his right to indemnification) at trial, and relied instead on SEC filings stating that the corporation "agrees to hold harmless each director . . . generally to the full extent permitted by" law. *Id.* at 81–82. The Delaware Supreme Court found that the corporation was not estopped from denying the terms of the agreement based on the above non-specific and general language, which did not amount to a "promise" on which the director could rely. *Id.* at 86–87. The court reached these conclusions after full discovery and based on evidentiary burdens. *See id.* Here, the statements of the Record Date were one of past fact, not future promise; it was highly specific in identifying a date certain; and unlike the plaintiff in *VonFeldt*, Sabby relies on

31

Jupiter's SEC filings to supplement other evidence and raise direct inferences, not to relieve itself of a critical evidentiary burden.

The District Court next relied on *U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 804 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008). (JA 152.) That case involved claims by the U.S. Virgin Islands against the receiver of distributions from a dissolved corporation nine years after the distribution for environmental degradation. 937 A.2d at 763-64. The Virgin Islands claimed that the receiver was estopped from denying liability, based on the dissolved corporation's proxy statement of a decade earlier, which "warned [that] distributees [] 'may be liable for any unpaid portion of [the dissolved corporation's] liabilities." *Id.* at 783. The Delaware Chancery Court found that the promissory estoppel claim "fail[ed] the straight face test," because the "descriptive" and conditional language in the proxy statement "did nothing more than warn" shareholders of "the jurisprudential reality . . . [that] the liability of stockholders receiving distributions from a dissolving corporation was uncertain." *Id.* at 805. Here, Jupiter's statements were not a warning of potential future liability, or uncertain future events. Jupiter simply announced the Record Date, which had been set by its Board.

The District Court distinguished *Unisuper Ltd.* v. *News Corp.*, No. 1699-N, 2005 WL 3529317, at *8 (Del. Ch. Dec. 20, 2005), relied upon by Sabby, on the basis that that case included allegations "'that an oral promise was made during

conversations' between the plaintiff and defendant." (JA 153.) To the contrary, the Delaware court found that the "complaint [did] not describe with any detail when defendants allegedly [made] promise[s]" to the defendant. *Unisuper Ltd.*, 2005 WL 3529317, at *8. That court accepted general allegations about direct negotiations between the parties, and did not reach the issue of whether a later press release, describing the result of those negotiations, alone, was an enforceable promise. *See id.* at *3. The case also involved promises about *future* board action (i.e., that the board would not adopt a "poison pill" defense without a shareholder vote), not a statement about past action already taken by the board, with future implications. *See id.* at *7. Based on this distinction, the District Court concluded that the Record Date was not an enforceable promise because it was not "made to [Sabby] *personally*." (JA 153) (emphasis in original). But there is no requirement in Delaware law that a promise be made "personally."

*Second*, the District Court held that Sabby's reliance upon the Record Date was "not reasonable when the statements [were] merely expressing future intention." (JA 154.) But as discussed above, the Record Date was not a "future intention." It was a date certain, established by past Board action, for determining shareholders of record if and when the SEC accepted the registration statement. (JA 29, ¶ 11.) Indeed, the very purpose of declaring a dividend and announcing a Record Date was

to induce reliance on the part of investors, giving the assurance that a dividend would in fact issue.

It is true, as the District Court points out, that announcements of the SRM Dividend included caveats regarding "expectations" and "intentions," but those concerned the distribution date. Sabby reasonably could and did understand that the distribution date was uncertain, while the Record Date was fixed in the event of the distribution. For instance, the June 27, 2023 press release makes a declarative statement of fact with respect to the Record Date: "the record date for the spin-off and distribution of shares of common stock, . . . *has been set* for July 7, 2023." (JA 72) (emphasis added). In contrast, it makes conditional statements regarding the distribution itself: "[t]he distribution is *expected* to paid on or about July 12, 2023, *subject to* . . . ." (JA 72) (emphasis added). Sabby's understanding is vindicated by the events alleged in the Amended Complaint: the Jupiter Board never did act to change the Record Date, and Jupiter's post-distribution SEC filing indicates that Jupiter itself understood the Record Date remained July 7, 2023. (*See* JA 29, 30, ¶¶ 11, 12, 15, 16.)

Because the declaration of the Record Date was not a forward-looking promise, but a statement of fact based on Board action and the future implications of that action, and because Sabby was justified in relying on those statements, the District Court erred in dismissing Sabby's promissory estoppel claim.

### III. THE DISTRICT COURT ERRED IN DISMISSING SABBY'S THIRD CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION

Sabby's third cause of action is for negligent misrepresentation. The Amended Complaint alleges that Jupiter negligently misrepresented that the Record Date was July 7, 2023, when it had no ability to distribute the dividend to holders of record. (JA 35, ¶¶ 48-55). The District Court dismissed Sabby's negligent misrepresentation claim upon a finding that documents "released to the public at large" cannot support such a claim. (JA 156.)

A negligent misrepresentation claim arises where "(1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information." *Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, C.A. No. 3231-VCS, 2008 WL 963048, at *8 (Del. Ch. Apr. 10, 2008).

The District Court ruled that Sabby did not have a pecuniary or "special" relationship with Jupiter based on the manner in which the misrepresentation was made. (JA 155-156.) The District Court held that misrepresentations in "documents released to the public at large" do not support a claim "even when it is a shareholder plaintiff that claims reliance on the public statements." (JA 156.) The implication of

the District Court's theory is that a corporation can never be held liable to shareholders for otherwise actionable negligent falsehoods, if those misrepresentations are also disseminated publicly, such as by posting on a corporate website.

Sabby was a shareholder of Jupiter on the Record Date and thus had the requisite pecuniary relationship. Jupiter and its Board owe a duty of care and candor to Sabby and other shareholders. *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). Jupiter therefore owed a duty to Sabby as a shareholder; from the Record Date forward, Jupiter owed a duty to Sabby as a dividend beneficiary and creditor. *See Anadarko Petrol. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1175 (Del. 1988) ("[U]pon a valid declaration of a dividend the corporation becomes indebted to the stockholder . . . ."). For the same reasons, Sabby also had a special relationship with Jupiter when the Record Date was announced, which required utmost candor and due care. *Mills Acquisition Co.*, 559 A.2d at 1280.

The caselaw does not support an exemption to protect false statements that reach a protected audience (those to whom a pecuniary duty is owed) and others. In *Glosser v. Cellcor Inc.*, the Delaware Chancery Court found sufficient a theory of negligent misrepresentation based upon a prospectus, which was also available to the public. *Glosser v. Cellcor Inc.*, Civ. A. No. 12725, 1994 WL 593929 at *22 (Del.

36

Ch. Sept. 2, 1994). In *Glosser*, the Chancery Court explained the nuance of the rule: "a claim of negligent misrepresentation may only be brought by members of a limited group of persons who were intended to be benefitted by the dissemination of the information." *Id.* Thus, there is no absolute bar to negligent misrepresentation claims based on public documents; the key inquiry is whether the plaintiff was a member of the group intended to be benefited by the information—an analysis which the District Court did not undertake.

Here, just because the press releases and SEC filings were available to the public does not mean that they were not also directed to "a limited group of persons" for whose benefit and guidance the information was intended. *Id.* The press releases and SEC filings announced a right available only to Jupiter's shareholders "who would foreseeably rely upon statements contained within." *Id.*

The District Court distinguished *Glosser* on the basis that the "*Glosser* court's analysis depended on a finding that a prospectus was 'materially different' from other SEC filings and from press releases, such that a negligent misrepresentation claim could survive." (JA 158.) While the District Court held that *Glosser* "confirmed" that "press releases or even 8K or 10K filings" (in contrast to a prospectus) cannot establish a special duty of care (JA 158), the full context of the *Glosser* court's analysis does not support the District Court's reading:

> While it has been held that general statements such as
> press releases or even 8K and 10K filings are directed to

> the general public and do not implicate a class to which a special duty of care is owed, (*e.g., Delmarva Power, supra, Brickman v. Tyco Toys, Inc*., 772 F. Supp. 1054 (S.D.N.Y. 1989), a prospectus is, I think, materially different.

*Glosser*, 1994 WL 593929, at *22.

First, the Chancery Court is merely noting that it had "been held" that certain "general statements" are insufficient to create a duty of care, while citing an out-of-state case, and then distinguishing itself from it. It was not reaffirming or "confirming" a particular rule. *Id.* Second, *Glosser* was a class action, and the court was specifically considering whether certain public filings could support a "class," meaning that every member in that class had to be part of "a limited group of persons for whose benefit and guidance" the prospectus was intended. *Id.* at *22 n.49. This is not a class action, and Sabby does not need to prove that the public at large was part of the group for whose benefit the press releases and SEC filings were intended—only that *Sabby* was part of that group.

More importantly, the statement at issue was not a generic promise aimed at the investing public. It was a false statement about a record date and plan of distribution to holders as of that date. While Jupiter had indeed set the Record Date, it had no ability to issue a dividend to record date holders. Its promise to do so was false.

38

Moreover, the cases cited by the District Court do not support the exemption for false statements that reach a protected recipient along with a wider audience. To the contrary, the first case relied upon by the District Court, (JA 156), reaffirms that the inquiry is about whether plaintiff is a "person[] for whose benefit and guidance the information is intended." *Brug v. Enstar Grp., Inc.*, 755 F. Supp. 1247, 1258 (D. Del. 1991) (internal quotations omitted). *Brug* was a class action, and the court was concerned that "any member of the public who might choose to invest" in the company's stock would have qualified as part of the protected class. *Id.* The class members were not existing shareholders, as Sabby was on the Record Date, rendering the potential scope of liability undefined in a way that is not an issue here. *See id*. at 1252. Moreover, the plaintiffs did "not allege that they themselves, or the members of the class they seek to represent, read the" public disclosures at issue. *Id.* In contrast, Sabby has alleged that it "read and relied upon" Jupiter's various announcements, and was a shareholder on the Record Date. (JA 29, ¶¶ 13, 15.)

The second case relied upon by the District Court, *In re Delmarva Sec. Litig.*, (JA 156), involves the same issues as *Brug*—namely, a class action in which plaintiffs claimed that "potential investors[] constitute a class of persons for whose benefit that duty was created." *In re Delmarva Sec. Litig.*, 794 F. Supp. 1293, 1310 (D. Del. 1992). As described above, those same issues are not present here.

The third case relied upon by the District Court involved a different issue altogether—a lender brought a negligent misrepresentation claim against a debtor that went into bankruptcy. (JA 156.) In *Vichi v. Koninklijke Philips Electronics, N.V.*, the Chancery Court reasoned that to establish a pecuniary duty, the plaintiff needed to show that the defendant "expected to profit from the course of conduct in which he provided the information, such that he could reasonably be expected to take reasonable care in providing that information." *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 763 (Del. Ch. 2014) (cleaned up). The Delaware Chancery Court only found that there was no pecuniary duty because the public statements at issue "were not made within the context of the Loan transaction" and therefore not in a context in which the debtor had a pecuniary interest. *Id.* at 822. Here, the District Court never ruled that Jupiter had no financial interest in the disclosures at issue (nor could it, given that they were part of Jupiter's efforts to increase the value of its shareholders).

The fourth case relied upon by the District Court similarly involved an entirely different issue—claims of negligent misrepresentation for *omissions*. (JA 156.) There, the Delaware Chancery Court expressed concern about liability for directors who were "ordinarily negligent in not knowing the facts that made those statements misleading." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854

A.2d 121, 163 (Del. Ch. 2004). Sabby is not alleging claims based on omissions here.

Finally, the District Court held that Sabby's reliance upon the Record Date announcements was unreasonable. The District Court erred in this respect for the reasons discussed *supra*, § II.

## IV. THE DISTRICT COURT ERRED IN DISMISSING SABBY'S FOURTH CAUSE OF ACTION FOR NEGLIGENCE

Sabby's fourth cause of action asserted a claim for negligence based on Jupiter's failure to exercise reasonable care in issuing the SRM Dividend, and ultimately issuing it to the wrong set of shareholders, which resulted in over $300,000 in financial loss to Sabby.

The District Court dismissed Sabby's negligence claim on the grounds that Jupiter did not owe a fiduciary duty to its stockholders. (JA 161.) As the District Court acknowledged, "To state a cause of action for negligence under Delaware law, a plaintiff must allege '[i] the defendant owed the plaintiff a duty of care; [ii] the defendant breached that duty; [iii] the plaintiff was injured; and [iv] the defendant's breach was the proximate cause of the plaintiff's injury.'" (JA 160) (citing *Campbell v. DiSabatino*, 947 A.2d 1116, 1117 (Del. 2008)). There is no fiduciary duty requirement for a negligence claim, and the District Court cited no support for such a requirement. In spite of this, the District Court dismissed Sabby's claim based on

the notion that "corporations do not owe fiduciary duties to their stockholders." (JA 160-61.)

Contrary to the District Court's suggestion, Sabby did not need to plead a fiduciary duty as an element for this claim, only a duty of care. "It is established American legal doctrine that [] each person owes a duty to those who may foreseeably be harmed by her action to take such steps as a reasonably prudent person would take in similar circumstances to avoid such harm to others." *Harris v. Carter*, 582 A.2d 222, 234–35 (Del. Ch. 1990); *see Figueroa v. Tornabene*, 74 A.D.3d 872, 873 (2d Dep't 2010) (ordinary duty of care requires the "exercise [of the] reasonable degree of diligence and care, which a … [person] of ordinary prudence might be expected to exercise under the same circumstances"); *Commerzbank AG v. U.S. Bank Nat'l Ass'n*., 277 F. Supp. 3d 483, 497 (S.D.N.Y. 2017) *aff'd in part, vacated in part on unrelated grounds*, 100 F.4th 362 (2d Cir. 2024) (duty of "due care" arose regardless of contractual or special duties). Sabby pled such a duty of care. (JA 32, 36, ¶¶ 29–30, 59.)

The District Court went on to find that a plaintiff's "avenue of redress for challenging allegedly false statements of a corporation, when bringing an action against a corporation as opposed to its Board, is [] a claim for negligent misrepresentation or equitable fraud." (JA 161.) However, Sabby's negligence claim did not involve misrepresentations. The negligence claim asserts liability based on

Jupiter's negligent *actions* in effectuating a distribution of shares to entirely the wrong set of shareholders, with adverse consequences for Sabby. (JA 32-33, 36, ¶¶ 29-31, 57-58.) The District Court ignored Sabby's allegations regarding how and why Jupiter misfired in issuing the SRM Dividend, causing loss to Sabby which had short position on August 14, 2023.

The Amended Complaint explains that an issuer exercising reasonable care would have promptly alerted its transfer agent as well as Depository Trust Company and FINRA of the Record Date after it was set by the Board. (JA 32-33, ¶ 30.) As a result of its own carelessness, Defendant failed to take appropriate steps to assure that shareholders as of July 7, 2023 were identified on the records of broker dealers and nominee holders so that those shareholders would receive the dividend. (JA 32-33, ¶ 30.) The steps necessary to identify shareholders as of a record date are commonly used by issuers, including, for example, to identify record date shareholders entitled to vote at annual shareholders meetings. (JA 32-33, ¶ 30.)

Jupiter had ample notice of short positions and should have understood that its carelessness would have negative consequences for non-record date investors. *See Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 830 (Del. 1995) ("An event is foreseeable if a defendant should have recognized the risk of injury under the circumstances."). The existence of short interests in Jupiter shares was well known through public reports on NASDAQ, including the existence of 1,507,316

shares worth of short interests on July 31, 2023. (JA 31, ¶ 25.) Loss was the natural and foreseeable consequence to these short positions if Jupiter failed to honor the Record Date.

The District Court erred by adding new and unnecessary elements to Sabby's negligence claim.

## **CONCLUSION**

For the reasons discussed above, Appellant Sabby Volatility Warrant Master Fund Ltd. respectfully submits that the District Court erred in granting Appellee Jupiter Wellness, Inc.'s Motion to Dismiss as to each of Sabby's claims and asks this Court to reverse and remand the District Court's Opinion and Order accordingly.

Dated:    New York, New York
          December 9, 2024

OLSHAN FROME WOLOSKY LLP

By:   /s/ *Thomas J. Fleming*
       Thomas J. Fleming
       Natasha G. Menell
       Sahand Farahati
       1325 Avenue of the Americas
       New York, New York 10019
       (212) 451-2300

       *Attorneys for Plaintiff-Appellant Sabby Volatility Warrant Master Fund Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,359 words, excluding the parts of the brief exempted Federal Rule of Appellate Procedure 32(f) and the rules of this Court. In making this certification, I have relied upon the word count function in Microsoft Word.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally space typeface using Microsoft Word in Times New Roman, font size 14.

By:  <u>/s/ *Thomas J. Fleming*          </u>